On the 26th day of October, 1903, the Electrical Commission for the City of Baltimore leased unto the Electric Light and Power Company, the predecessors of the appellant company, duct space for its cables and wires in the conduit system constructed in the streets of the City by the Electrical Commission.
Upon the execution of the lease the lessee placed its cables and wires in the ducts so rented by it, and used the same in supplying light and power to its patrons or customers throughout the City. Since the execution of the lease some of the cables and wires of the lessee have at different times been shifted from the positions or ducts in which they were originally placed to other ducts upon the order of the lessor, but the frequency with which this has been done is not disclosed by the Record. In this case, however, we are only concerned with the shiftings that were made under the orders of August 15th, 1912, and February 3rd, 1913. These orders were signed by George W. Wennagel, a representative of the lessor, and approved by Raleigh C. Thomas, Chief Engineer of the Electrical Commission.
On July 30th, 1912, W.P. Beyerle, a representative of the lessee wrote Mr. Thomas saying:
 "Will you please issue this company an order to rearrange our cables, at the expense of the Electrical Commission, in manholes as listed below, on account of the alterations which have been recently made?"
In the list mentioned is the manhole at Baltimore and Sharp Streets.
In reply to this letter Mr. Thomas wrote Mr. Beyerle, saying:
 "As regards the recently reconstructed manholes located Baltimore and Sharp Streets, * * * you are hereby requested and authorized to proceed with the work of rearranging your cables contained therein to conform to the altered conditions. Under the terms *Page 683 
of your lease one-half of the expense connected with these changes will be paid by the City."
On August 15th, 1912, an order of that date was forwarded to the appellant, and is as follows:
 "Please rearrange your cable layout in the manhole located at Baltimore and Sharp street, to conform to the altered conditions, as per our letter of August 2d 1912."
On February 3rd, 1913, Mr. Thomas again wrote to Mr. Beyerle, saying:
 "In order to permit of the construction of the recreation pier at the foot of Broadway, I am sending you an order authorizing you, subject to the terms of your lease and to the supervision of this department, to transfer your equipment from the conduits which must be immediately abandoned on the south side of Thames Street between the junction boxes located at the southwest and the northeast corners of Broadway to the new conduits just completed which connect the same two holes via the north side of Thames Street."
With this letter was enclosed the order of February 3rd, 1913, which is as follows:
 "Please transfer your equipment from the conduits on the south side of Thames Street, between the southwest and the northeast corners of Broadway to the new conduits on the north side of Thames Street, between the same points, to permit of the construction of the recreation pier at the foot of Broadway."
After receiving the above orders the appellant proceeded to comply with them, and when the work was completed, the appellant, in accordance with the lease, as they constructed it, sent to the appellee for payment a bill for one-half of the amount expended for labor and material used in making the changes and shiftings at each of the above named places. The *Page 684 
bills as presented to the appellee contained items of charges for cable, wire, copper and lead sleeves, solder, gasoline, waste, candles, paste, tape, cement, rope, etc.
The appellee on March 26th, 1914, wrote to the appellant company and in speaking of the bill of expenses for the shifting of the cable at Baltimore and Sharp Streets said: "This charge is correct, except for the items for cable used. When these are eliminated and a properly revised bill rendered, we will pass same for payment," and in respect to the bill of expenses for the Thames and Broadway Street shifting said: "The charge for cable installed and credit for old cable recovered should be eliminated. When this is done the bill will be put through for prompt payment."
The appellant, declined to eliminate these disputed items from the bills and the appellee refused to pay the same, because, as stated by the only witness who attempted to give a reason therefor, the cable and wire were "an asset of the Consolidated Gas Company, and a part of their physical valuation." The appellee offered to pay the bills with said items eliminated, and when suit was instituted by the appellant, the appellee paid into Court the amount of said bills less the disputed items and at the trial of the case below, the Court, sitting as a jury, rendered a verdict in favor of the plaintiff for the sum of $80.63, the amount of said bills less the disputed charges, and upon this verdict a judgment was entered. It is from that judgment that this appeal was taken.
The sole question before us on this appeal, is whether or not, under the lease, the appellee was to pay for any part of the additional cable and wire used in the changes and shifts made upon the orders of the appellee, at the places mentioned. The provisions of the lease upon which the determination of this question depends is as follows: "That if at any time or times hereafter the lessor shall, without the assent of the lessee, require the lessee to shift its cables and wires or any part or parts thereof from one set of ducts to another, in said municipal conduit works, one-half of the expense *Page 685 
thereof shall be borne and paid by the Mayor and City Council of Baltimore."
The bills rendered to the appellee for the work and material used at Baltimore and Sharp Streets amounted to $119.66, one-half of which was $59.83. To this amount was added $5.98, or one-half of ten per cent for supervision, office expense and use of tools, making a total of $65.81, the amount claimed by the appellant to be due and owing by the City under the lease.
The disputed items in this bill consisted of 7 feet of cable valued at $8.66, 22 pounds of wire valued at $3.72, 26 feet and 2 inches of No. 8 are cable valued at $7.46, 4 feet of cable valued at $1.36, making a total of $21.20. This amount deducted from the total amount of the bill left $98.46. One-half of this amount ($49.23), together with the sum of $4.92, or one-half of ten per cent for supervision, office expense, etc., amounted to $54.15, which the appellee conceded to be owing by it. The difference in the amounts claimed to be owing was $11.66.
The items of debit and credit that were asked to be eliminated from the bill rendered the appellee for work and material used in the Thames and Broadway Street transaction are as follows:
 Value of Material Used.
 Value of Cable Installed:
 97' 3" 500,000 S.C.P. L. — 240V ................. $43.77
 44' 6" #8 Arc Cable ............................... 11.79
 46 lbs. 350,000 S.C.M. Wire ....................... 6.90
 ______
 $62.46
 Value of Good Cable Recovered:
 61' 6" 500,000 S.C.P. L. — 240V ................. $27.68
 18 lbs. 350,000 S.C.S.M. Wire ..................... 2.70
 20' Arc Cable ..................................... 5.30
 Value Junk Cable returned ......................... 2.76
 ______
 $38.44
 *Page 686 
The balance of the bill amounted to $48.15, one-half of which, $24.08, together with $2.40, the City's part of the expenses for supervision, etc., amounted to $26.48. The amount that the appellant claimed that the City was owing on this work was $39.07. The difference in the amount said by the parties to be owing was $13.22.
In this connection, however, it is stated in the appellant's brief that "upon the determination of this case rests the settlement of a large number of bills."
The shifting of the cable and wires at Baltimore and Sharp Streets became necessary because of the enlargement of the manhole by the City. The enlargement was made by extending both its south and east walls.
While this work was being done the cables were hung upon supports temporarily constructed in the manhole, and when the new walls were completed the cable and wires were out, spliced, and placed upon hangers attached to the new walls. As the hole was enlarged and the circumstances increased, more cable and wire was required because of the enlargement.
Additional cable and wire was also made necessary because of the loss in cutting and splicing the cable, as was explained by one of the witnesses who stated that "you always lose a certain amount of cable in cutting it, for instance, in making a splice you have to cut back your lead a certain distance and when you cover that cable you must cut the lead off so that you can seal it up." The Record discloses that the shifting of the cable and wires in the manhole in no wise benefited the appellant company, "as it worked just as good before, as after the new cable was put in," and resulted in no additional profit to the company.
The shifting of the cable at Thames and Broadway Streets was made necessary by reason of the building of the City Recreation Pier, as shown by the letter of Mr. Thomas to the appellant of February 3rd, 1913, in which he says: "In order to permit of the construction of the Recreation Pier at the foot of Broadway, I am sending you an order * * * to *Page 687 
transfer your equipment from the conduits which must be immediately abandoned on the south side of Thomas Street between the junction boxes located at the southwest and the northeast corners of Broadway to the new conduits just completed, which connect the same two holes via the north side of Thames Street."
The appellant was required by the order of the City to remove its cable and wires from the conduits in which they were then located, to the new conduits which had been recently completed by the City, and to avoid cutting off the service, it allowed the cable and wires to remain as they were in the old conduits until they had placed the cables and wires in the new ones, and then removed the cables and wires from the old ones. It is not shown by the Record that the appellant was at all benefited by the shifting of said cable and wires, although the cables and wires may have been lengthened. The City was charged for one-half of the cable and wire that was placed in the new conduits, and was allowed a credit, at the same price per foot or pound, for one-half of the cable and wire that was removed from the old conduits. The quantity of cable and wire placed in the new being greater than the cable and wire in the old, the City was called upon to pay one-half of the cost of such excess, which it refused to pay.
In the two above-mentioned cases the shifting of the cable and wires were not made with the assent of the appellant company, and under the lease "one-half of the expense thereof" was to be borne by the Mayor and City Council of Baltimore. Therefore, we are to determine what is to be included within the term "expense." The City contends that the cost of the additional cable and wires is not to be included within this term, because the cable and wires are an asset of the company and a part of its physical valuation, although its liability for the payment of all other material, including solder, sleeves, etc., as well as the labor used in connection with the installation of the same is conceded by it. *Page 688 
This is not, we think, the proper test to be applied in determining the question as to what was intended by the parties to the lease, to be included within the term "expense."
It was contemplated by them, at the time of the execution of the lease, that it would be necessary to change or shift the cable and wires of the company from time to time to conform to the changes and conditions in the Municipal conduit system, and that in making such shiftings or changes the company would not at all times be benefited thereby, and when not so benefited it would not be willing to make such shiftings at its own expense. It was, we think, because of this fact, that the lease provides that the expense shall be borne equally by the City and the company, and we think, in such cases, the expenses includes the cost of the additional cable and wire if any are used in making such shiftings.
The Court below granted the prayers of the appellee which were based upon this contention as we have stated it, and rejected the prayer of the appellant. The Court erred, we think, in so ruling, and because of which we will reverse the judgment of the Court below.
Judgment reversed and new trial awarded, with costs to theappellant. *Page 689